IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Patricia Giacalone-Soltesz,      :
         Petitioner      :
          :
       v.      : No. 1034 C.D. 2016
     : SUBMITTED: December 23, 2016
Workers' Compensation Appeal      :
Board (Fayette Resources, Inc.),      :
         Respondent      :


BEFORE:     HONORABLE ROBERT SIMPSON, Judge
               HONORABLE JULIA K. HEARTHWAY, Judge
               HONORABLE JOSEPH M. COSGROVE, Judge


OPINION NOT REPORTED


MEMORANDUM OPINION
BY JUDGE HEARTHWAY           FILED: March 28, 2017


       Patricia Giacalone-Soltesz (Claimant), *pro se*, petitions for review of the May 12, 2016, order of the Workers' Compensation Appeal Board (Board), which affirmed the decision of the workers' compensation judge (WCJ) denying and dismissing Claimant's claim petition. We affirm.

       On April 1, 2011, Claimant filed a claim petition alleging that she sustained a work-related injury on December 25, 2010, during the course of her employment with Fayette Resources, Inc. (Employer). Subsequently, that claim petition was withdrawn without prejudice, and on October 11, 2013, Claimant, through new counsel, filed a new claim petition (Claim Petition) concerning the

December 25, 2010, injury.[1]   Several hearings were held on the Claim Petition,[2] and a hearing was also held on July 26, 2011, relative to the first claim petition; testimony from that hearing was incorporated into the record in this proceeding. (WCJ's Findings of Fact (F.F.) Nos. 1-3.)

At the July 26, 2011 hearing, Claimant testified that she was employed with Employer as a residential instructor at a group home for three ladies. (F.F. No. 3b.) Claimant testified that on December 25, 2010, when she was attempting to assist a 67-year old resident with changing her "Depends," the lady put her hands together and hit Claimant on the back of her head. (F.F. No. 3b.) Claimant testified that throughout the course of the day, she noticed her neck becoming tighter, and by the end of the day, she had a splitting migraine headache. (F.F. No. 3b.)   Claimant testified that she told her co-worker, Jessica, what happened and also reported the incident to the on-call supervisor Chrystal Marie. (F.F. No. 3b; R.R. at 94a.)   Claimant acknowledged that, as part of her employment, she makes daily computer entries documenting the residents' activities, including behavioral issues, which she then prints off and signs. (F.F No. 3g.) Claimant acknowledged that the report for December 25, 2010, did not indicate that she was struck by one of the residents, but Claimant stated this was "because they erased it." (F.F No. 3g; R.R. at 114a.)

---

[1] Claimant's initial claim petition is not part of the record certified to this Court, presumably because it was filed in a separate matter.  Claimant's subsequent Claim Petition alleged "[c]losed head injury and cervical strain on the left shoulder.  Type 2 Slap Lesion Arthroscopy." (Certified Record.)

[2] As of the May 5, 2015, hearing, Claimant had amended the Claim Petition to seek approval of a compromise and release agreement, but that request was subsequently withdrawn.

Claimant further testified that she continued working and believed she first sought treatment on December 28, 2010, at Dubois Medical Center. She stated she spoke to Natalie, and that Natalie gave her a list of doctors. (R.R. at 96a; *see* F.F. No. 3c.) Claimant further testified that she continues to have symptoms in her neck from her shoulder blades into her head, and that doing anything physical makes it worse. (F.F. No. 3e.) Claimant feels she cannot return to her regular duties because of the pain, and denied having worked anywhere since the injury. (F.F. No. 3e.) Claimant acknowledged that she was terminated from her employment; it was her understanding this was because she was arrested in 2000, and she did not include that on her employment application. (F.F. No. 3d.)

At the July 26, 2011, hearing, Employer also presented the testimony of Denise Lynn Mullins (Mullins), who supervised the house at which Claimant worked on the date of the alleged injury and reviewed the daily computer generated reports. Ms. Mullins stated that she had no conversations with Claimant between December 25, 2010, and December 30, 2010, about the alleged incident, nor did she ever receive any information that Claimant reported the alleged incident to anyone else on staff. Mullins stated that on December 30, 2010, she told Claimant that her clearance had come back bad, and that therefore Mullins was required to immediately terminate Claimant's employment. Mullins testified that later that same day, Natalie Kunkle (Kunkle) asked Mullins if she was aware of any injury at work, because Claimant apparently discussed an injury with Kunkle after Mullins spoke with Claimant. (*See* F.F. Nos. 4a-b.)

Employer also presented the testimony of Kunkle at the July 26, 2011, hearing, whose responsibilities include human resources. Kunkle testified that it takes some time to receive a response for a criminal background check. She confirmed that Employer received documentation that Claimant had some kind of criminal record which required Employer to immediately terminate Claimant's employment. Kunkle testified that the first time Claimant told Kunkle that Claimant sustained a work-related injury was after Kunkle advised Claimant of her termination. (F.F. Nos. 5a-b.)

At the July 26, 2011, hearing, Employer also presented the testimony of Mark Hamilton (Hamilton), Employer's Regional Director. Hamilton testified that, by regulation, Employer was required to terminate Claimant's employment because she was not able to obtain FBI clearance. (F.F. No. 6a.)

Subsequent to the refiling of the Claim Petition, a hearing was held on May 6, 2014, at which Claimant again testified. (F.F. No. 7.) She testified that she continued to receive medical treatment, and at that time was currently with Dr. Gerhart. (F.F. No. 7a.) She testified that about a year and half prior, Dr. Gillespie performed surgery. (F.F. No. 7a.) In explaining how her shoulder was injured, Claimant stated that when she was struck, she hit the ground with her arms extended in front of her and her neck was where she felt the most pain. (F.F. No. 7b; R.R. at 12a.)

Claimant was questioned about an independent medical examination (IME) report of Robert Lee Waltrip, M.D, which she stated she was very unhappy

4

with, asserting that Dr. Waltrip switched her words. (F.F. No. 7c.) She agreed she had some medical issues prior to December 25, 2010, due to a domestic violence incident. (F. F. No. 7c.) Claimant acknowledged having prior surgery to her left shoulder in 2009 and that she was in an automobile accident in which she sustained whiplash, but stated she had recovered. (F.F. No. 7d.) On cross-examination, Claimant acknowledged Dr. Gillespie performed shoulder surgery in July of 2012, but she asserted this was prior to her motor vehicle accident, which occurred in January of 2012. (F.F. No. 7g; R.R. at 27a-28a.)

In support of her Claim Petition, Claimant presented the deposition testimony of Guy H. Gerhart, M.D., taken on October 23, 2014. Dr. Gerhart is board certified in internal medicine. Dr. Gerhart testified that he first began treating Claimant on September 6, 2013, for complaints of ulcers, headache, low back pain and anxiety. Dr. Gerhart stated that Claimant reported a history of a work injury on December 25, 2010, when while bending down putting Depends on a resident at a home where she worked, she was hit on the back of her head, landing on her shoulder. She also presented additional complaints, including but not limited to neck pain, lumbar pain, fatigue, migraine headaches, and history of stroke.

Dr. Gerhart opined that, with respect to the injury of December 25, 2010, he diagnosed Claimant with a rotator cuff tear of the labrum, and that Dr. Gillespie performed shoulder surgery on that in August of 2012. Although Dr. Gerhart initially denied being aware of any shoulder surgeries prior to 2012, he then acknowledged that Claimant must have had some problem with her shoulder

5

in 2009. Dr. Gerhart indicated the basis of his opinion was that there were no prior complaints of shoulder discomfort prior to the December 25, 2010, except for a little bit of acromial pressure she had in 2009. Dr. Gerhart opined that Claimant could not perform her position as a caretaker of handicapped individuals from the time of her injury to the present.[3]

On cross-examination, Dr. Gerhart acknowledged that at the time of Claimant's first examination, Claimant did not say anything about her left shoulder. Dr. Gerhart agreed that the first mention of shoulder complaints in the medical reports, subsequent to his initial treatment of Claimant, was on June 10, 2014, when Claimant saw a Dr. Rappaport. Dr. Gerhart also reviewed MRI and CT scans of Claimant's head, neck, and shoulders, and he acknowledged that there were no abnormal findings. Dr. Gerhart further acknowledged that the day of his deposition was the first time he had an opportunity to review medical reports concerning other treatment provided to Claimant from 2009 through the commencement of his treatment. (F.F. Nos. 8f-h.)

In opposition to the Claim Petition, Employer presented the deposition testimony of Dr. Waltrip, taken on February 23, 2015. Dr. Waltrip is board certified in orthopedic surgery and performed an IME on Claimant on April 10, 2014, with respect to the alleged work-related injury. As part of the evaluation, Dr. Waltrip reviewed imaging studies, records from Dr. Gerhart, and Claimant's

---

[3] Dr. Gerhart acknowledged he had the opportunity to review IME reports of Dr. Harvey on June 15, 2011, and Dr. Waltrip on April 10, 2014, as well as diagnostic studies. (F.F. Nos. 8a-e.)

6

testimony from July 26, 2011. Dr. Waltrip testified that Claimant initially denied any history of pain, injury or treatment to her neck prior to December 25, 2010; however, she subsequently acknowledged a neck and back injury which she attributed to a domestic dispute in January 2010. Dr. Waltrip also noted that Claimant's medical records contradicted the history Claimant provided. In particular, Claimant was seen at DuBois Medical Center emergency room on December 11, 2009, with severe neck pain, radiating to her head, and she was diagnosed with a cervical sprain and muscle spasm. Additional records from 2010, including an ambulance sheet, reported head and neck pain after an assault. Claimant had undergone CT scans of her head and neck. As of February of 2010, the records reflected a three month history of pain, and as of April 2010, Claimant was diagnosed with chronic neck pain. (F.F. Nos. 9a-b.)

With respect to Claimant's shoulder, Dr. Waltrip testified that Claimant initially denied a history of pain before December 2010. Claimant later acknowledged a history but attempted to minimize it. She stated she could not recall how she injured it and believed she underwent surgery when she was twenty years old, with everything being fine within three to four months. Dr. Waltrip noted, however, that Claimant's history was again inaccurate because medical records indicated she underwent surgery in 2009, with a reported prior injury with a different employer in November 2008. (F.F. No. 9c.)

With respect to the alleged work-related injury, Claimant told Dr. Waltrip that a resident struck her on the back of her neck, and she fell forward, resulting in pain throughout her entire body. Claimant reported pain in her neck,

7

left shoulder and entire left arm. Dr. Waltrip noted that medical records from five days after the work incident reported complaints of neck pain and a headache but no specific symptoms for her left shoulder. A CT scan was negative for any abnormality. A MRI of the cervical spine in October 2011 was normal, and a CT scan in July 2011 was also normal. (F.F. No. 9d.)

Dr. Waltrip noted that records reflected that Claimant was involved in a motor vehicle accident on January 18, 2012, resulting in pain in the left shoulder and a neck injury. Dr. Waltrip noted this was the first record after December 25, 2010, to suggest a shoulder injury. Dr. Waltrip noted that studies obtained after the motor vehicle accident showed findings consistent with those back in 2009. Claimant subsequently was evaluated by Dr. Gillespie who performed surgery on August 7, 2012. Dr. Waltrip noted that at the time of his evaluation, Claimant's complaints were similar to those reported in old medical records. Claimant reported to him that she did not think she could do any kind of job. Claimant's examination was objectively normal. (F.F. Nos. 9e-h.)

Dr. Waltrip opined that if Claimant sustained an injury on December 25, 2010, it would have been nothing more than a cervical strain; the medical records did not suggest that the left shoulder problems were related to the work incident. Dr. Waltrip acknowledged he was giving Claimant the benefit of the doubt, although he questioned whether he should do that given she provided an inaccurate history to him concerning her pre-existing problems. He also opined that in the event Claimant had sustained a cervical strain, she was fully recovered from it.

8

The WCJ found Claimant's testimony was not credible and rejected it. The WCJ explained his reasons, including that Claimant's testimony was replete with inconsistencies. The WCJ also noted that even Dr. Gerhart acknowledged Claimant did not initially report a history of left shoulder pain to him. The WCJ also noted that Employer's representatives consistently testified that no one was aware of any alleged incident until after Claimant's employment was terminated. The WCJ stated that to accept Claimant's testimony, one would have to conclude that Employer fraudulently redacted Claimant's daily logs; such a conclusion was not warranted in light of the numerous discrepancies between Claimant's own testimony and the medical records. (F.F. No. 10b.)

The WCJ also rejected the testimony and opinions of Dr. Gerhart. The WCJ explained that Dr. Gerhart's opinion was based upon a factual history found to be inconsistent with other credible medical evidence or history. The WCJ further noted that Dr. Gerhart's testimony was somewhat internally inconsistent and that he had a minimal amount of medical history to rely on compared to Dr. Waltrip. (F.F. No. 10c.)

The WCJ generally accepted the testimony and opinions of Dr. Waltrip, except for his giving Claimant any benefit of the doubt that she may have had a cervical sprain.[4] The WCJ also found Dr. Waltrip's testimony to be more

---

[4] The WCJ noted that Dr. Waltrip himself even questioned whether he should give Claimant the benefit of the doubt with respect to sustaining an injury, and such questioning was merited.

persuasive and probative, because Dr. Waltrip was an orthopedic surgeon, presenting opinions as to an orthopedic injury, as opposed to Dr. Gerhart, who is board certified in internal medicine. (F.F. No. 10d.)

The WCJ also found the testimony of Mullins, Kunkle, and Hamilton to be credible. The WCJ stated each testified in a fairly direct, non-evasive manner with open and honest demeanor. Additionally, the testimony was consistent and supported by documentary evidence. (F.F No. 10e.)

The WCJ concluded that Claimant did not meet her burden of proving that she sustained an injury during the course of her employment with Employer on December 25, 2010, or that any of her restrictions were causally related to her employment.[5] (F.F. No. 10, WCJ's Conclusions of Law (C.L.) No. 3.) Accordingly, the WCJ denied and dismissed Claimant's Claim Petition.

Claimant appealed to the Board, which affirmed the WCJ's decision. Claimant now petitions this Court for review of the Board's order.[6] Before this Court, Claimant argues that the Board and WCJ erred in concluding that she did not sustain her burden to prove a work-related injury.

---

[5] Claimant was represented by counsel during the proceedings before the WCJ. The WCJ concluded Employer's contest was reasonable, and, therefore, Employer was not responsible for any award of attorneys' fees or costs. (C.L. No. 4.)

[6] Our scope of review is limited to determining whether constitutional rights have been violated, whether an error of law was committed and whether necessary findings of fact are supported by substantial evidence. *Johnson v. Workmen's Compensation Appeal Board (Dubois Courier Express)*, 631 A.2d 693 (Pa. Cmwlth. 1993).

In arguing the Board's decision should be overturned, Claimant asserts that a doctor's report stated that this was a work-related injury.[7] Claimant also contends that there was a discrepancy between Kunkle's and Mullins' testimony in that Mullins said she called Claimant at her home to tell her she was fired and Kunkle said she called the house where Claimant was working to tell her she was fired. Claimant also states there is a discrepancy in the emergency room report because the nurse said the injury was work-related and the doctor said it happened at home. Insisting that she is an honest person, Claimant maintains that she was not lying, but instead, could not remember dates because she had a stroke three to four weeks prior to her IME appointment and was too embarrassed to tell the doctor she could not remember. However, Claimant's assertions do not constitute a basis for this Court to upset the Board's determination.

In a claim petition proceeding, the claimant bears the burden of proving all of the elements necessary to support an award. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 634 A.2d 592 (Pa. 1993). Where the causal relationship between the work incident and the disabling injury is not obvious, unequivocal medical evidence is necessary to establish the relationship. *Jeannette District Memorial Hospital v. Workmen's Compensation Appeal Board (Mesich)*, 668 A.2d 249 (Pa. Cmwlth. 1995). Additionally, where

---

[7] Claimant does not refer to the doctor by name. However, it appears Claimant is referring to a report by Dr. Gillespie. Claimant contends that this evidence was overlooked at the first hearing. This Court has already addressed this particular matter. Previously, Claimant attempted to submit this report into evidence before this Court. By order entered August 24, 2016, Senior Judge Keith B. Quigley denied Claimant's Motion to Submit New Evidence. Accordingly, we will not revisit this issue, and this report is not part of the record certified to this Court.

the connection between a work-related injury and ongoing disability is not obvious, medical evidence is required. *Cromie v. Workmen's Compensation Appeal Board (Anchor Hocking Corporation)*, 600 A.2d 677 (Pa. Cmwlth. 1991).

Claimant's arguments are nothing more than an attempt to argue her preferred version of the facts. However, the WCJ rejected Claimant's testimony as well as her medical evidence, and, instead, accepted Employer's evidence. It is well-settled that it is solely within the province of the WCJ to determine the weight and credibility of the evidence presented, and he is free to accept or reject the testimony of any witness in whole or in part, even where such testimony is inconsistent. *See Investors Diversified Services v. Workmen's Compensation Appeal Board (Howar)*, 520 A.2d 958, 962 (Pa. Cmwlth. 1987). The fact that Claimant disagrees with the WCJ's credibility determinations does not establish an error of law on the part of the WCJ. The WCJ's findings in this case, including the reasons why he accepted or rejected particular evidence, are extremely detailed. The WCJ's findings of fact are supported by substantial evidence. Thus, the Board did not err in affirming the WCJ's determination that Claimant failed to sustain her burden to prove a work-related injury.

Accordingly, we affirm the Board's order.

_____
JULIA K. HEARTHWAY, Judge

Judge Cosgrove concurs in the result only.

12

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Patricia Giacalone-Soltesz, :
               Petitioner :
            :
        v. : No. 1034 C.D. 2016
            :
Workers' Compensation Appeal :
Board (Fayette Resources, Inc.), :
              Respondent :

O R D E R

AND NOW, this 28th day of March, 2017, the order of the Workers' Compensation Appeal Board is hereby affirmed.

_____
JULIA K. HEARTHWAY, Judge